UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| David Winder, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | Civil Action No. 1:25-cv-8297 |
| v. | § | |
| | § | |
| Oscar Health, Inc., Oscar Health Plan of New | § | |
| York, Inc., Oscar Health Agency Inc., Will | § | |
| Dunham, and David Byttow, | § | |
| | § | |
| *Defendants*. | § | |

Plaintiff David Winder ("Plaintiff"), by his counsel, Harman Green PC, alleges for his

Complaint against Defendants Oscar Health, Inc., Oscar Health Plan of New York, Inc., Oscar

Health Agency Inc., ("Oscar"), Will Dunham, and David Byttow (collectively "Defendants") as

follows:

**PRELIMINARY STATEMENT**

1.      This case is about the illegal termination of a senior, long-term employee.

2.      Plaintiff was deliberately terminated by Defendants because Plaintiff was poised to

take paternity leave for a new born child, and to prevent him from gaining additional equities.

Defendants Byttow and Dunham masterminded and facilitated the illegal termination, hinging the

use of paternity leave on the execution of a waiver and release, a waiver and release that would

have prevented Plaintiff from obtaining the equities he was contractually entitled to.

3.      Plaintiff was the Senior Director of Engineering in the Infrastructure Department.

4.      Plaintiff worked in the Infrastructure Department for three and a half years,

confirming that he was, at all times, fully qualified for his role.

5.      Plaintiff was illegally terminated after electing to take, and commencing, paternity

leave.

1

6.     The illegal termination was done deliberately to eliminate an employee who intended to and did, in fact, exercise his contractual and statutory right to care for and bond with his newly born child.

7.     This illegal termination was also completed in bad faith to avoid Plaintiff vesting in the Oscar' Restricted Stock Units which have substantial value.

8.     Plaintiff brings claims under Family Medical Leave Act ("FMLA") against Oscar, The New York Paid Leave Act against Oscar, Breach of Contract against Oscar, and The New York City Human Rights Law against all Defendants.

## JURISDICTION

9.     Pursuant to 28 U.S.C. §1331 this Court may properly hear Plaintiff's claims as they arise under a federal statute.

10.    As well, pursuant to 28 U.S.C. §1332, there is complete diversity of parties and the amount in controversy exceeds $75,000.

11.    Pursuant to 28 U.S.C. §1367 this Court may properly hear Plaintiff's State and local law claims as they arise out of the same nucleus of operative fact so as to create the same case or controversy.

## PARTIES

12.    Plaintiff was and is a resident of New Jersey.

13.    Defendant Oscar Health, Inc. is incorporated in the State of Delaware and is serviceable through Corporation Service Company at 80 STATE STREET, ALBANY, NY, UNITED STATES, 12207 - 2543.

14.    Upon information and belief, Defendant Oscar Health Plan of New York, Inc. is a wholly owned subsidiary of Oscar Health, Inc., and has a principal place of business at 111 EIGHTH AVENUE, NEW YORK, NY, UNITED STATES, 10011.

15.    Upon information and belief, Defendant Oscar Health Agency Inc. is a wholly

2

owned subsidiary of Oscar Health, Inc., and has a service address at ATTN: VP, LEGAL AND COMPLIANCE, 295 LAFAYETTE STREET, 6TH FL., NEW YORK, NY, UNITED STATES, 10012.

16.     All three Oscar Defendants are one in the same in that they had simultaneous control over Plaintiff's work performance and employ over 3,000 employees.

17.     Defendant Will Dunham, upon information and belief, resides in New York State.

18.     Defendant David Byttow, upon information and belief resides at 400 W 61ST ST APT 1416, NEW YORK, NY 10023-0226.

## JURY DEMAND

19.     Plaintiff respectfully requests a trial by jury.

## STATEMENT OF FACTS

20.     Plaintiff began his employment with Defendant on February 28th, 2022.

21.     At all times, Plaintiff was qualified for his employment as evidenced by his continued employment for many years, as well as promotions and pay increases.

22.     Plaintiff was employed by Oscar as a Senior Director of Engineering, and earned approximately $300,000 per year with a performance based bonus of approximately 20% base pay.

23.     Plaintiff's was contractually owed Restricted Stock Units (RSUs) based on his longevity within the company.

24.     In the financial year of 2024, four vesting cycles resulted in 42,058 RSUs ($650,216.68 with Oscar Health at 15.46 per share) for Plaintiff.

25.     Plaintiff's RSUs vested every three months.  In the short future, Plaintiff would have earned 21,029 additional RSUs before the end of the year, 2025

26.     On September 1st, Plaintiff would have received 12,073 Share Units (RSU) = $184,354.71 at $15.27 a share.

3

27. On December 1st, Plaintiff would have received 12,073 Share Units (RSU) = $184,354.71 at $15.27 a share.

28. As a result of the termination, a portion was prorated, leaving Plaintiff with 1,672 RSU's to be vested September 1st.

29. Plaintiff's vesting schedule would continue into the future for the duration of his employment had he not been illegally terminated.

30. Plaintiff always received a "meeting expectations" or "exceeding expectations" on his performance reviews.

31. Plaintiff never received any complaints from Human Resources about his performance nor did he anticipate that his employment would ever end for a performance based reason.

32. Plaintiff was promoted to "Senior Director of Engineering" in March 2024 and received a base pay increase to the $300,000 identified above.

33. In this senior role, Plaintiff formally oversaw three of the five teams in the Infrastructure Department and informally oversaw the entire department for prolonged periods of time.

34. Defendants commenced a campaign of retaliation against Plaintiff the moment he announced that he would be taking paternity leave in the near future.

35. Plaintiff announced intended paternity leave in March 2025 and separate leave periods were approved for the summer and fall of 2025.

36. Immediately after this announcement, Oscar began a search for Plaintiff's replacement as Oscar had no intention of accommodating Plaintiff by having someone temporarily take over Plaintiff's job responsibilities while he took paternity leave.

37. On July 18, 2025 Plaintiff started paternity leave as his son was born.

4

38.    Upon information and belief, Defendant Dunham was intimately involved in Plaintiff's leave approval and the decision to terminate his employment.

39.    Defendant Dunham and Plaintiff had previously worked together to approve FMLA leave for other employees.

40.    Plaintiff intended to return on August 8, 2025, work for 90 days and take the remaining bonding leave (7 weeks) starting November 10, 2025 and continuing until January 2026.

41.    On July 21, 2025, Plaintiff was fully approved for leaves through January 11, 2026.

---

**Remaining Parental Leave - Received**

**Chase Lazar** <chase@hioscar.com>                                    Mon, Jul 21, 2025 at 6:05 PM
To: David Winder <dwinder@hioscar.com>, David Winder <djwinder@gmail.com>
Cc: David Byttow <dbyttow@hioscar.com>, People Service Center <PeopleServiceCenter@hioscar.com>

Hi David -

Prudential provided us with confirmation of the rest of your parental leave for bonding.  The requested dates are as follows:

**11/10/25 - 12/28/25** (remaining Oscar bonding leave; 7 weeks)

**12/29/25 - 1/11/26** (remaining FMLA and/or NY PFL leave; 2 weeks)

*Remember to let us know when your leave actually begins.*

---

42.    As well, Plaintiff was approved for Family Medical Leave Act ("FMLA") leave, but was denied the opportunity as Defendants interfered with Plaintiff's right to rely on FMLA protected leave.

43.    As demonstrated by the email correspondence above, Plaintiff was entitled to FMLA leave, Oscar is an employer under the FMLA, Plaintiff communicated that he wished to rely on the FMLA, and the Oscar Defendants denied Plaintiff the opportunity to exercise his rights under the FMLA.

44.    On July 28, 2025, Gregory Chagnon started work while Plaintiff was on paternity leave.

45.    Mr. Chagnon was given a different title than Plaintiff, but, really, performed the

exact same role as Plaintiff by managing the Infrastructure Department.

46.    At no time was Plaintiff considered for a promotion to formally and permanently oversee all five teams of the Infrastructure Department.

47.    Mr. Chagnon was onboarded to take on all of Plaintiff's job responsibilities as Oscar, at the behest of Defendants Byttow and Dunham, fully intended to terminate Plaintiff for his use of FMLA and paternity leave.

48.    On August 5, 2025, David Byttow (Plaintiff's manager) sent him a text message at 9:35am requesting that he join a meeting at 11:15am.

49.    Plaintiff was terminated at this meeting.

50.    That day, many employees in the Operations organization were terminated.

51.    However, even though terminations occurred across Oscar and, particularly in Operations, the vast majority of Infrastructure team remained intact, and Plaintiff was the only member of his direct and indirect reporting structure that was terminated.

52.    Plaintiff believes that he was targeted because of his use of paternity leave.

53.    All Defendants knew of Plaintiff's paternity leave, and all Defendants knew that Plaintiff would have a young child at home following his leave, meaning Defendants held a perspective that he would be distracted at work when he returned.

54.    Defendants decided "to include" Plaintiff in the reduction in force solely to fabricate a legitimate basis for his termination.

55.    Prior to his termination, Plaintiff oversaw five teams in the Infrastructure Department.

56.    Plaintiff formally oversaw three departments, and Defendant Byttow oversaw two.

57.    In reality, Plaintiff oversaw all five.

58.    Mr. Chagnon was hired to oversee the three departments Plaintiff was formally

attached to, and did oversee only those departments.

59.     Stated differently, Plaintiff did more work for Oscar than what Mr. Chagnon was hired to do.

60.     Plaintiff also earned a lower base pay, lower bonus, and held a lower title than Mr. Chagnon.

61.     Oscar's claimed basis for terminating Plaintiff was company downsizing – yet it hired someone to do less work for a higher base pay than Plaintiff.

62.     Oscar's entire claimed basis for termination is completely fabricated and pretextual.

63.     The only true explanation for Plaintiff's termination is that he was targeted as a person with a young child at home and that child would be a 'distraction.'

64.     As well, Plaintiff was targeted because of his forthcoming RSU vesting schedule.

65.     Plaintiff's paternity leave is both protected by statute and by contract.

66.     Oscar, through its handbook, agreed to allow Plaintiff paternity leave.

67.     Oscar did not allow that paternity leave in full when Oscar terminated Plaintiff.

68.     Oscar owed Plaintiff RSUs for continued employment.

69.     Oscar violated that contract by illegally terminating Plaintiff in violation of numerous statutes before he was to vest.

70.     Upon information and belief, Defendant Dunham was aware of Plaintiff's paternity leave and approved his termination.

71.     However, Defendant Dunham required Plaintiff to sign a waiver and release in order to receive some or all of his pay during paternity and FMLA leave, pay that he was already entitled to by contract and statute

72.     Upon information and belief, Defendant Byttow requested Plaintiff be permanently replaced by Mr. Chagnon.

73.    Defendants Dunham and Byttow conspired to terminate Plaintiff because of his status as a new parent, and exercise of contractual and statutory rights to paternity leave.

74.    Defendant Dunham is senior employment counsel for Oscar.

## CAUSES OF ACTION
## FIRST CLAIM

**Discrimination under the New York Paid Family Leave Act**

75. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 74 with the same force as though separately alleged herein.

76. Under the New York Paid Family Leave Act, employees are entitled to take job protected, paid leave when their child is born.

77. Plaintiff was an employee within the meaning of the statute.

78. Defendants were employers within the meaning of the statute.

79. Plaintiff was entitled to take up to 12 weeks of leave at 67% of his average weekly wage.

80. Plaintiff was entitled to job protected leave while utilizing his paid family leave.

81. Plaintiff was approved for paid leave under the statute while employed by Oscar.

82. Plaintiff was terminated while on leave in violation of the statute.

83. Plaintiff was terminated after taking leave in violation of the statute.

84. Plaintiff was terminated in advance of taking leave in violation of the statute.

85. As such, Oscar intentionally and willfully violated Plaintiff's right to be free from discrimination, and owes Plaintiff all front pay, back pay, value in equities such as restricted stock units, emotional distress damages, punitive damages, attorney fees, costs, and expenses, all in an amount no less than $2,500,000.

## SECOND CLAIM

**Breach of Contract**

86. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 74 with the same force as though separately alleged herein.

87. Plaintiff formed a contract for employment with Oscar.

9

88.     Oscar promised Plaintiff he would receive RSUs for his continued employment.

89.     Oscar promised paternity leave as a benefit for his continued employment.

90.     At all times, Plaintiff performed on the contract and offered his continued employment, which is consideration under the law.

91.     Oscar failed to perform on the contract.

92.     Oscar wrongfully prevented Plaintiff from continuing his employment in an effort to prevent Plaintiff from earning additional RSUs and to prevent Plaintiff from accessing his paid paternity leave.

93.     As such, Oscar intentionally and willfully violated Plaintiff's right to perform on the contract, breached the contract, failed to performance on the contract, and owes Plaintiff all benefits available to him under the contract, value in equities such as restricted stock units, attorney fees, costs, and expenses, all in an amount no less than $2,500,000.

## THIRD CLAIM

**Discrimination under the New York City Human Rights Law**
94.     Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 74 with the same force as though separately alleged herein.

95.      The New York City Human Rights law prevents discrimination on the basis of gender, age, and caregiver status, among other protected traits.

96.     The New York City Human Rights Law provides for individual liability, and this claim is brought against all Defendants.

97.     Plaintiff is a man with a newly born son.

98.     Plaintiff was terminated and replaced by an older man who does not have young children at home.

99.     Plaintiff's termination was pretextual.

10

100. Plaintiff was only terminated so that he could be replaced by a more senior, older employee who did not have the limitations of a newborn child at home.

101. Defendants perceived that Plaintiff would be distracted at work because of his newborn child.

102. Rather than allow Plaintiff continued employment, Defendants terminated Plaintiff because of his protected characteristic as a new father.

103. As such, Defendants intentionally and willfully violated Plaintiff's right to be free from discrimination, and owes Plaintiff all front pay, back pay, value in equities such as restricted stock units, emotional distress damages, punitive damages, attorney fees, costs, and expenses, all in an amount no less than $2,500,000.

## FOURTH CLAIM

### Interference with Family Medical Leave Act

104. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 74 with the same force as though separately alleged herein.

105. Plaintiff is an employee within the meaning of the Family Medical Leave Act.

106. Oscar Defendants are employers within the meaning of the Family Medical Leave Act.

107. The Family Medical Leave Act allows for up to twelve weeks of job protected leave in a qualifying calendar year.

108. Plaintiff was entitled to Family Medical Leave Act in the year he sought that leave.

109. Plaintiff was approved for Family Medical Leave Act leave.

110. Plaintiff was wrongfully denied Family Medical Leave Act leave and, ultimately, was not offered his position back once he began a medical leave.

111.    As such, Oscar interfered with Plaintiff's rights under the Family Medical Leave Act.

112.    Oscar discriminated against Plaintiff because he sought to rely on the Family Medical Leave Act.

113.    As such, Oscar intentionally and willfully violated Plaintiff's right to be free from discrimination, and owes Plaintiff all front pay, back pay, value in equities such as restricted stock units, emotional distress damages, punitive damages, attorney fees, costs, and expenses, all in an amount no less than $2,500,000.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests the following relief:

A.  For the first cause of action, damages for wages and emotional distress, value in equities such as restricted stock units, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements, all in an amount no less than $2,500,000;

B.  For the second cause of action, damages for wages and emotional distress, value in equities such as restricted stock units, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements, all in an amount no less than $2,500,000;

C.  For the third cause of action, damages for wages and emotional distress, value in equities such as restricted stock units, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements, all in an amount no less than $2,500,000;

D.  For the fourth cause of action, damages for wages and emotional distress, value in equities such as restricted stock units, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements, all in an amount no less than $2,500,000; and

E.  For such other and further relief as the Court deems just and proper.

Dated:
October 7, 2025

HARMAN GREEN PC

By: _____
Walker G. Harman, Jr.
140 Broadway, Fl 46
New York, NY 10005
824 Exposition Ave.,
Suite 8
Dallas, Texas 75226
(646) 248-2288
wharman@theharmanfirm.com
erichardson@theharmanfirm.com
*Attorneys for Plaintiff*

13